***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and employer-defendant.
3. Electric Insurance Company is the carrier on risk.
4. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
5. Industrial Commission forms and filings relative to this case were stipulated into evidence as Stipulated Exhibit 2.
 ***********
Based upon all the evidence adduced from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Full Commission, plaintiff was 63 years old and was a high school graduate. Plaintiff began work with defendant-employer in March 1979 as a utility operator. His duties included working as a polisher on channels and working in the powder and sandblaster sections.
2. Defendant-employer made components and pellets for nuclear energy. They also made aircraft parts. Plaintiff worked in the nuclear plant section for approximately eleven years. He then went to work in the aircraft section for an additional ten or eleven years. His duties there included shipping and receiving, driving the forklift, and working in the forging and chip areas. In October 1999, plaintiff's duties mainly consisted of gathering components together to make an engine kit to ship to Ohio.
3. On 26 October 1999, plaintiff helped other employees pack laptop computers in a box. Plaintiff remarked that it was unusual to be packing laptop computers for surplus. At the end of his shift, the packed boxes containing the computers had been put to the side for pickup on the next day.
4. On 28 October 1999, plaintiff was summoned by Andrea Hughes, a human resources manager; Todd Best, an ombudsman; a security guard; and Ron Judge, a supervisor. Plaintiff believed that he was being sought out for receipt of an award. However, Ms. Hughes told plaintiff that some of the laptop computers were missing from the shipment the day before. Plaintiff assured Ms. Hughes that he did not have anything to do with the missing laptop computers. Plaintiff left the room for a short while and then returned. Ms. Hughes had interviewed the other employees who had helped pack the computers. Ms. Hughes told plaintiff that none of their stories matched, so she was firing him. The security guard escorted plaintiff to his locker, where plaintiff retrieved his belongings; took plaintiff's employee identification badge; and escorted him to the parking lot, where they removed his parking sticker off of his vehicle. Plaintiff was extremely surprised and upset that he had been fired. The other employees had also been fired.
5. During the following week, plaintiff was requested to return to work. He was given back his identification badge and parking sticker. He was given a document called "decision making leave" and advised that he was on "crisis suspension" because he was observed away from his work area and in the parking lot without permission on 26 October 1999. He was further cited for failing to secure property under his control. Plaintiff appealed the crisis suspension to a peer review committee. At the review hearing, plaintiff was "visibly shaking."
6. When plaintiff returned to work, many employees asked plaintiff about what had happened. He was harassed and called, "Thief." People were constantly pointing at plaintiff. Plaintiff became nervous, panicky and paranoid.
7. Plaintiff received a letter from the peer review committee reminding him of rules regarding breaks away from the workstation. Defendant-employer did not find any evidence that plaintiff had stolen anything.
8. Even after the appeal was over, plaintiff could not sleep at night and continued feeling paranoid. He began having panic attacks. He asked for help through the employee assistance program (EAP), which referred him to Dr. Koff, a clinical psychologist. Dr. Koff diagnosed plaintiff with adjustment disorder with mixed features. Dr. Koff testified that but for the October 1999 incident, plaintiff most likely would not have developed his condition.
9. When plaintiff's condition did not improve after seeing Dr. Koff, he sought treatment with Dr. Robert H. Weinstein, who diagnosed plaintiff with major depression with obsessions and prescribed Prozac. Dr. Weinstein treated plaintiff with supportive therapy and medicines such as antidepressants, sleeping pills, and atypical antipsychotics. Dr. Weinstein opined that plaintiff's condition was caused by the circumstances surrounding plaintiff's firing at work. He described plaintiff's symptoms as shame, humiliation and abandonment. Dr. Weinstein believed that plaintiff would need medication and support for the rest of his life and would not be able to maintain regular attendance in any employment. Plaintiff's specific diagnosis was major depression with obsessions.
10. Dr. Weinstein suggested that plaintiff change jobs. Plaintiff applied for and secured a position in the nuclear plant section. His duties included cleaning parts. However, plaintiff was unable to concentrate. Employees continued to ask plaintiff about the computer incident. Plaintiff saw Ms. Hughes from a distance in April 2000 and he "felt like all [he] wanted to do was grab her neck and choke her to death." He continued to work until 7 June 2000. Plaintiff decided to take an early retirement but was advised by Donna Dailey in human resources to go out on short-term disability. Plaintiff's application for short-term disability was denied.
11. In July 2000, plaintiff moved to Indian Trail, North Carolina. He secured a job with Lab Corp, but was unable to keep it due to his panic attacks and inability to concentrate. Due to his inability to sleep, plaintiff no longer sleeps with his wife at night.
12. After two years of treatment, Dr. Weinstein placed plaintiff at maximum medical improvement and stated that plaintiff was permanently and totally disabled from all types of employment. Dr. Weinstein noted that plaintiff was also possibly suffering from post-traumatic stress disorder.
13. On 21 August 2002, John F. Warren, III, Ph.D. performed an independent psychological evaluation on plaintiff. Dr. Warren concluded that plaintiff exhibited either malingering or factitious disorder, where a patient presents symptoms to express anger and dissatisfaction. He opined that plaintiff's symptoms were out of proportion to the incident at work.
14. Plaintiff contends that he sustained a mental injury by accident arising out of his employment with defendant on or about 26 October 1999. Plaintiff further contends that the meeting with Ms. Hughes and his abrupt firing were unexpected and that his firing resulted from allegations relating to the performance of his job duties. Specifically, plaintiff was fired abruptly because some laptop computers that he had helped co-workers pack were missing or stolen. Since plaintiff did not steal the computers, he had no expectation of being accused of stealing and was extremely surprised, upset and humiliated by his firing.
15. As a result of being accused of stealing, fired and his treatment after he returned to work, plaintiff developed "major depression with obsessions" and possibly post-traumatic stress disorder, which led to his incapacity to work on 7 June 2000 and continuing.
16. Even though the sudden meeting and abrupt firing of plaintiff due to accusations of stealing were unexpected and not reasonably designed by plaintiff, he has not shown that such occurrences were unusual workplace occurrences. Therefore, plaintiff has not shown that his development of major depression with obsession constituted an injury by accident. Plaintiff also has not proven that he sustained a compensable occupational disease because he has not proven that he has post-traumatic stress disorder and his "major depression with obsessions" developed over time due to a number of events that occurred after his return to work. Moreover, plaintiff is not claiming that he suffers from an occupational disease.
17. Plaintiff's average weekly wage was $832.90, which yields a compensation rate of $555.54.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has not proven that he suffered an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. An injury is compensable under the North Carolina Workers' Compensation Act if: (1) it is caused by an "accident;" and (2) the accident arises out of and in the course of employment. N.C. Gen. Stat. § 97-2(6) (2003). "The claimant bears the burden of proving these elements[,]" including the existence of an accident. Smith v. Pinkerton's Sec. and Investigations,146 N.C. App. 278, 280, 552 S.E.2d 682, 684 (2001). An accident under the workers' compensation act has been defined as "`an unlooked for and untoward event which is not expected or designed by the person who suffers the injury,'" and which involves "`the interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences.'" Calderwood v. Charlotte-Mecklenburg Hosp. Auth.,135 N.C. App. 112, 115, 519 S.E.2d 61, 63 (1999). Plaintiff has not shown by the greater weight of the evidence that the meeting with Ms. Hughes and his subsequent firing constituted a compensable injury by accident.
3. Although plaintiff is claiming he suffered an injury by accident, the facts in this case are similar to those of Woody v.Thomasville Upholstery, Inc., 355 N.C. 483, 562 S.E.2d 422
(2002). Woody involved an occupational disease claim where the plaintiff's psychological injury claim developed over time due to abusive treatment by her supervisor. The court held that abusive treatment "can occur with any employee in any industry or profession, or indeed, in similar abusive relationships outside the workplace[.]" Woody v. Thomasville Upholstery, Inc.,146 N.C. App. 187, 202, 552 S.E.2d 202, 211 (2001) (Martin, J. dissenting), rev. on dissent grounds, 355 N.C. 483,562 S.E.2d 422 (2002). The plaintiff in Woody was unable to show that her condition was peculiar to her particular employment and to which general public was not equally exposed. Id. In the instant case, plaintiff has not shown evidence of either a compensable injury by accident or an occupational disease. Plaintiff has arguably shown unfair treatment by his employer, which was unexpected, but the fact that the unfair treatment was unexpected does not make it an "unusual" or "unforeseen" condition of his employment, under the rationale of Woody.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim is and must be DENIED.
2. Each side shall pay its own costs.
This the ___ day of May 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER